EMALA *v.* BALTIMORE COUNTY, MARYLAND

[No. 34, September Term, 1960.]

*Decided November 8, 1960.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*James A. Pine,* with whom was *Bernard J. Medairy, Jr.,* on the brief, for appellant.

*James D. Nolan,* with whom was *Johnson Bowie* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

Appellant Emala, who was discharged from his position of guard at the Baltimore County jail, appeals from a denial of his petition for reinstatement "without loss of pay or pension benefit" because he was not served with written notice of his discharge and given a hearing.

Emala served as a guard from 1952 until April 1956, when he was dismissed for dereliction of duty, and had the status of a permanent employee of Baltimore County. Code of Public Local Laws of Baltimore County (1955), Title 24, Sec. 358, provided that a permanent employee could be dismissed whenever his work or misconduct so warranted in the judgment of the appointing authority, on the recommendation of the department head, and then went on:

> "When the Department Head decides to take such action he shall file with the employee and the Personnel and Salary Advisory Board a written notification containing a statement of the substantial reasons for the action. The employee shall be notified not later than the effective date of the action. The notice shall inform the employee that he shall be allowed two calendar weeks from the effective date of the action to file a reply with the appointing authority and the Personnel and Salary Advisory Board and to request a hearing before the Personnel and Salary Advisory Board."

Judge Gontrum found as facts that Emala on various occasions had appeared at work intoxicated and once was sent home because of his alcoholic condition and because he slept on the job. He had been warned a number of times. On April 3, 1956, he showed definite signs of intoxication when he reported for work. On April 4 he failed to appear for

work. His department head, Warden Joseph Butt, went to Emala's house, where Emala refused to see him. Mr. Butt then conferred with the personnel director of Baltimore County and a notice of dismissal was prepared. Later in the day of April 4, the warden called Mrs. Emala and told her of her husband's dismissal. On April 9 Emala phoned the jail and told the deputy warden and a guard that if the warden came to his house he would kill him, he would shoot him.

Between April 4 and April 9, Emala had come to Towson but had not visited the warden, and had engaged a lawyer to whom he had turned over his guard's badge. On April 9, the warden drove to Emala's house with a county policeman. The warden says he had the official notice of dismissal in his pocket. The policeman says it was clipped to Emala's pay check. The policeman went to the door and attempted to give Emala the check, while the warden stayed in the car. Emala was, in the policeman's words, "drunk and disorderly." In an abusive manner he told the officer he would not give him his badge and would not accept the check. He said: "I will sue them" and "I will have you fired." Suit was filed on April 27. A few days later, the personnel director of the County offered Emala a hearing before the Personnel and Salary Board, as the statute calls for. He refused the offer through his lawyer on the ground that it came too late, after suit had been filed.

Judge Gontrum took judicial notice that Warden Butt is "a uniquely dedicated and conscientious official" and "an understanding and kindly man," who would be the last person in the world "to act hastily or arbitrarily toward an employee." He found that although the letter of the law had not been complied with, Emala had rendered notification impracticable, if not impossible, and so dispensed with its necessity. He said:

> "It is established to the Court's full satisfaction that Mr. Emala was a drunkard and an incompetent employee and had imposed outrageously upon the forbearance of his superior, Mr. Butt. It would seem a far-fetched extension of the powers of a Court of

Equity to direct the reinstatement of a man who consistently has been an unfaithful servant.

\* \* \*

"In this case, Mr. Emala had deliberately isolated himself and made it virtually impossible to have the notice served on him in an orderly manner; he had refused to see his superior; he had even threatened him with death. He now asserts a claim that he was entitled to have been treated with all the consideration with which a faithful and conscientious employee would have been entitled. Furthermore, Mr. Emala subsequently was offered an opportunity to have a hearing before the Personnel Board which he and his counsel refused. Finally, he has been given a full hearing before the Court of Equity in which he has presented all his witnesses and has had an opportunity of testifying in his own behalf.

\* \* \*

"The petitioner comes into a Court of Equity with hands both unclean and unsteady; he insists upon a technical compliance with the legal rule when he has violated both the spirit and letter of the law. In all equity and justice the taxpayers should not be called upon to pay a large sum to an employee who, in effect, discharged himself by his failure to report for work and his defiance to the very laws he now invokes, coupled with lethal threats directed toward the superior charged with delivering the notice he now urges as essential to his severance from the county payroll. Suppose he had carried out his threat to kill the Warden: would he have been entitled to act as his own Jailer and collect pay while awaiting trial for murder until the notice of dismissal had been served?

\* \* \*

"As to compensation, the Court holds that Mr. Emala is entitled to compensation up to the day that he was offered a hearing by the Personnel Director,

although I am inclined to the view that he should not be paid after April 3rd, when he walked out and subsequently refused to see his superior and threatened his life."

The decree denied reinstatement and directed that Emala be paid through May 4.

We agree with Judge Gontrum's analysis and disposition of the case. As he noted, 4 *McQuillen, Municipal Corporations* (3rd Ed. 1949), Sec. 12.258, finds the rule as to notice required by statute not to be completely rigid. "However, personal notice of dismissal, as required by law, may be dispensed with when to give it would be extremely impracticable, if not quite impossible * * *." See also 2 *Merrill on Notice,* Sec. 836: "If the noticee by his own acts prevents notification, it seems clear that the law should excuse it. In some of the situations the prevention results from acts by the noticee which might estop him from asserting the need for notification, but it seems alike accurate and convenient to group all these cases under the rubric of excuse." As to the latter point, compare *Duffey v. Rickard, Chief of Police,* 194 Md. 228, and 2 Merrill, *op. cit.,* Ch. 19 "Excuse of Notification," Sec. 822 (Futility), and Sec. 824 (Want of Injury).

It is plain that Emala's behavior rendered him completely unfit to continue as a jail guard, that his discharge was fully justified, and that he was fully aware from April 4 on, both that he had been dismissed and why. It is apparent that after April 4 he accepted the dismissal as an accomplished fact and soon consulted counsel. It appears that not only did he not seek, want or expect either written notice of his dismissal (personally delivered as the statute seems to anticipate) or an administrative hearing, but that he intended to rely on the failure of the County to comply with the technicalities of the law to compel payment to him of money he would have been paid had he continued in his employment. Permanent reinstatement would seem to have been beyond the realm of possibility. He must have realized that at whatever point the legal formalities as to dismissal were complied with he would be dismissed.

We find no merit in his contentions under the circumstances of the case.

*Decree affirmed, with costs.*